# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DONALDSONVILLE GLASS AND BODY WORKS, INC. | CIVIL ACTION |
| VERSUS | 22-817-SDD-RLB |
| CITY OF GONZALES, ET AL. | |

consolidated with

| | |
|---|---|
| SOUTHERN TOWING & TRANSPORT, LLC, ET AL | CIVIL ACTION |
| VERSUS | 23-473-SDD-RLB |
| CITY OF GONZALES | |

## **RULING**

This matter is before the Court on the Motion for Summary Judgment[1] filed by Defendant, City of Gonzales ("Defendant").  Plaintiffs, Southern Towing & Transport, LLC ("Southern Towing") and Gonzales Towing and Repair, Inc. (Gonzales Towing)(or collectively "Plaintiffs")  filed an Opposition[2] to this motion, to which the Defendant filed a Reply.[3] For the reasons below, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment.

---

[1] Rec. Doc. 39.
[2] Rec. Doc. 42.
[3] Rec. Doc. 43.

## I.    FACTUAL BACKGROUND

This lawsuit arises out of Plaintiffs' claim that the City of Gonzales violated their First Amendment rights of political speech and association and created an illegal monopoly by adopting a five-company towing rotation list for the City.[4]  The Plaintiffs were not selected to the Defendant's towing rotation list, allegedly because they did not support City of Gonzales Chief of Police Sherman Jackson's ("Chief Jackson") latest re-election bid.

The Defendant submits the following background and facts in support of its Motion for Summary Judgment

Louisiana Revised Statute 32:1735 sets forth the actions law enforcement must take when they determine a vehicle must be towed and the procedure for operating a towing rotation list.  Section A provides that an officer must first allow the owner or operator to choose a licensed towing company to tow their vehicle; however, if the owner or operator does not or cannot make this choice, the towing rotation list for the jurisdiction is utilized to select a towing company.

The towing rotation list consists of licensed towing companies within the jurisdiction.  Once a company is selected to perform a tow, that company moves to the end of the rotation, and the next company on the list is contacted for the next required tow.  Again, utilization of the towing rotation list only occurs when the owner or operator of the vehicle does not select their own towing company.[5]

Before creating its own rotation list in 2022, the City of Gonzales's towing was managed by the Ascension Parish Sheriff's Office, and Chief Jackson had no control or

---

[4] Rec. Doc. 18, ¶¶ 6, 13, 15, 16, 19, 22.
[5] La. R.S. 32:1735(D).

authority over any aspects of the rotation list.[6] However, due to some leadership changes in the Ascension Parish Sheriff's Office, which resulted in policy changes, Chief Jackson began exploring the possibility of creating his own towing rotation list for the City of Gonzales, and he tasked Officer Tyson Dennis ("Officer Dennis") to seek guidance from the State Police on how to accomplish this.[7]

Officer Dennis spoke regularly with the Louisiana State Police on how the City of Gonzales could properly create its own list pursuant to the applicable statutes and regulations.[8] Officer Dennis was advised that the City of Gonzales could create its own list, and Chief Jackson would have the sole discretion of who to place on the list.[9] Based on the State Police assurances and guidance, Chief Jackson instructed Officer Dennis to create the platform for the new towing rotation list.[10]

Officer Dennis created an application for the towing list, which Chief Jackson approved; they then discussed what companies could serve the city best and decided, for simplicity, they wanted only five companies on the list.[11] Chief Jackson and Officer Dennis established the application process. In theory, applications are initially reviewed by Officer Dennis and then brought to Chief Jackson for consideration.[12] Further, again for the sake of simplicity, Chief Jackson and Officer Dennis determined that management of the towing rotation list would "piggyback" off the State Police procedures, *i.e.*, if a towing company was accepted as compliant with the law by the State Police, the City of Gonzales could likewise consider that company for its list without Defendant independently vetting

---

[6] Rec. Doc. 39-5, pp. 13-14.
[7] *Id.* at pp. 15-16.
[8] Rec. Doc. 39-7, pp. 28-31.
[9] Rec. Doc. 39-5, p. 24.
[10] *Id.* at p. 31.
[11] *Id.* at pp. 32-33.
[12] *Id.* at p. 108.

that company. Conversely, if a towing company was found non-compliant, State Police would notify Officer Dennis of the violation, and the City of Gonzales would suspend or not consider that company.[13]  Because Louisiana law allows a municipality enforcing its own towing rotation list to adopt "minimum standards" consistent with the Office of State Police, or to comply with the standards established by State Police, Defendant was utilizing the exact systems of the State Police in following the law.[14]

Yancy Ball ("Ball") founded Gonzales Towing in 1997 and owns this company with his mother; there are no other employees of Gonzales Towing.[15]  Ball's mother handles the bookkeeping, and Ball alone drives the wrecker.[16]  The only services Gonzales Towing provides are towing and vehicle storage.[17] Currently, Gonzales Towing is on four rotations lists – Ascension Parish, the State Police of Ascension Parish, the State Police of Baton Rouge, and the City of St. Gabriel[18] – and, although it is not on Defendant's towing rotation list, Gonzales Towing still receives towing requests within the City of Gonzales.[19]

Chief Jackson has served as Chief of Police for the City of Gonzales for fifteen years and is currently in his fourth term.[20]  Ball donated $2,500 to Chief Jackson during his first political campaign for Chief of Police[21] because he believed Chief Jackson would be good for the towing community.[22]  Ball testified that he has never supported any of

---

[13] *Id.* at pp. 44-47, 97; Rec. Doc. 39-7, pp. 58-59, 62, 73.
[14] La. 32:1735(C).
[15] Rec. Doc. 39-4, pp. 15, 26-28.
[16] *Id.* at p. 114.
[17] *Id.* at p. 35.
[18] *Id.*
[19] *Id.* at p. 107.
[20] Rec. Doc. 39-5, p. 9.
[21] Rec. Doc. 39-4, pp. 75-76.
[22] *Id.* at pp. 82-83.

Chief Jackson's political opponents.[23]  During his deposition, Chief Jackson could not recall either Plaintiff ever contributing to his political campaigns.[24]

Colby Palmer ("Palmer") founded Southern Towing in 2021, and he is the sole driver for the company.[25]  The only services Southern Towing provides are towing and vehicle storage.[26] Southern Towing is currently on only one rotation list for the Ascension Parish Sheriff's Office, and this is the only towing rotation his company has been on since its inception.[27] Palmer testified that he has tried to get his company on additional towing rotation lists but has failed because "there's only so many spots."[28]  Although not on Defendant's list, Palmer acknowledged that he still receives special towing requests from the City of Gonzales.[29]

Palmer testified that Chief Jackson never asked him for a political donation, he has never made a donation to the Chief, and he has never supported any of the Chief's opponents.[30]  Palmer believes Southern Towing was originally on Defendant's rotation list but was removed because his "spot was bought by somebody else."[31]

Palmer and Ball testified that Ascension Parish Sheriff Bobby Webre ("Sheriff Webre") told them that if they wanted their companies on the City of Gonzales rotation list, they needed to give more political support to Chief Jackson.[32] Plaintiffs testified that they believed Sheriff Webre was speaking on behalf of Chief Jackson, or in other words,

---

[23] *Id.* at p. 79.
[24] Rec. Doc. 39-5, p. 133.
[25] Rec. Doc. 39-6, pp. 15, 17.
[26] *Id.* at p. 17.
[27] *Id.* at p. 20.
[28] *Id.*
[29] *Id.* at pp. 55-56.
[30] *Id.* at pp. 39-40.
[31] *Id.* at p. 46
[32] *Id.* at pp. 38-39; Rec. Doc. 39-4, p. 71.

delivering this message for Chief Jackson because he refused to meet with Palmer and Ball.[33]  Defendant contends that the Ascension Parish Sheriff's Office is an entirely separate entity, and Sheriff Webre was not speaking on behalf of Chief Jackson. Chief Jackson testified that "[a]nybody that offers me money to be on my list will not be on my list."[34]

Defendant maintains that neither Plaintiff ever submitted an application to be on Defendant's towing rotation list;[35] Defendant contends "nothing is preventing these plaintiffs from submitting an application to be placed" on its towing rotation list.[36] Moreover, Chief Jackson testified that he was not aware of Southern Towing's existence when Defendant's list was created.[37]  Five companies that applied for Defendant's 2022 towing list were accepted: American Towing, Ascension Towing, Carter's Towing, Fisher's Towing, and Tullier's Towing.[38]

Defendant maintains the evidence does not support Plaintiffs' theory that Chief Jackson only selected political contributors to the City of Gonzales towing list.  Although Plaintiffs allege that Daryl Tullier ("Tullier"), owner of Tullier's Towing, donated to Chief Jackson's campaign, Tullier testified under oath that he has never donated to Chief Jackson's campaigns.[39]  Ball testified that Karek's Wrecker Service donated to Chief Jackson,[40] but Karek's Wrecker Service was not selected to the towing list.  Further, if political donations were a requirement for selection, Plaintiff Gonzales Towing would have

---

[33] Rec. Doc. 39-4, p. 71; Rec. Doc. 39-6, pp. 38-39.
[34] Rec. Doc. 39-5, p. 80.
[35] Rec. Doc. 39-4, pp. 65-66; Rec. Doc. 39-5, p. 72; Rec. Doc. 39-6, p. 34.
[36] Rec. Doc. 39-5, pp. 75-76.
[37] *Id*. at pp. 54, 123, 141.
[38] Rec. Docs. 39-8, 39-9, 39-10, 39-11, 39—12.
[39] Rec. Doc. 39-13, pp.
[40] Rec. Doc. 39-4, p. 74.

made the list because Ball testified that he donated to Chief Jackson's first campaign.[41] Defendant maintains that, although Plaintiffs allege that towing list selections were made based on political support for Chief Jackson, this suggestion came from Sheriff Webre and not anyone associated with Defendant.[42]

After Gonzales Towing was not selected to Defendant's list, Ball contacted his friend, St. Gabriel Chief of Police Kevin Ambeau ("Chief Ambeau"), and asked him if Chief Ambeau would speak to Chief Jackson on behalf of Gonzales Towing.[43] Although Ball testified he did not ask Chief Ambeau to inquire about a dontation,[44] Chief Jackson testified that Chief Ambeau asked him if a political donation could result in a company being included on the towing list.[45]  Chief Jackson testified:

> He called me on the phone. He said, Yancy is trying to get on your wrecker list, or something to that nature, and I said, Chief, the decision is already made; Yancy is not on the list. Then he went on to say, well, is it possible he can give you some campaign money so he can get on the list? I said, I would think that would be unethical, probably against the law, at least coniving, right. I said, tell Yancy he can keep his money. I do not need money. So, that was the end of that conversation.[46]

Chief Jackson further testified that Gonzales Towing was free to apply to the rotation list, but "anybody that offers [him] money to be on [his] list will not be on [his] list."[47]

Defendant notes that Plaintiff Southern Towing applied to be on Troop A of the Office of State Police's towing rotation list (covering Ascension Parish), but it was not selected because all ten spots were full.[48]  Defendant contends this demonstrates that it

---

[41] *Id.* at p. 76.
[42] *See* Rec. Doc. 39-4, pp. 69-71; Rec. Doc. 39-6, p. 39.
[43] Rec. Doc. 39-4, p. 101.
[44] *Id.*
[45] Rec. Doc. 39-5, p. 79.
[46] *Id.*
[47] *Id.* at p. 80.
[48] Rec. Doc. 39-6, p. 25.

is lawful to have a limited number of spots and reject new applicants when all spots are filled. Additionally, Defendant notes that Plaintiffs are not the only companies that were not selected to its towing rotation list; Chief Jackson estimated that nine other towing companies that likely wanted to be on the list were not selected.[49]

Finally, Defendant contends Plaintiffs cannot show that they have suffered damages as a result of not being selected to Defendant's towing list.  Ball testified that Gonzales Towing made the same profits over the past four years,[50] and Palmer testified that his tax returns would not show any loss in revenues.[51]  Plaintiffs have produced no documents that would demonstrate any revenue loss because they are not on Defendant's towing rotation list.   Accordingly, Defendant maintains it is entitled to summary judgment.

Plaintiffs' version of events is remarkably different than Defendant's.  Plaintiffs are both duly licensed and certified companies operating towing and recovery services in Gonzales, Louisiana; they are both fully compliant with all applicable laws and regulations for the state of Louisiana.[52]  Plaintiffs claim that, historically, a significant portion of their business came from callouts by the Defendant City of Gonzales to tow vehicles.[53] However, in 2022, when Defendant decided to create its own list independent from the Ascension Parish Sheriff's Office list, their income significantly decreased.[54]

While Plaintiffs acknowledge that Chief Jackson directed Officer Dennis to coordinate with Louisiana State Police in creating and implementing Defendant's own

---

[49] Rec. Doc. 39-5, p. 69.
[50] Rec. Doc. 39-4, p. 114.
[51] Rec. Doc. 39-6, p. 48.
[52] Rec. Doc. 42-1, pp. 14-15; Rec. Doc. 42-2, pp. 15-16.
[53] Rec. Doc. 42-1, pp. 103-111 (these pages are not attached to Plaintiffs' exhibit; however, the Court accessed them via Defendant's exhibit, Rec. Doc. 39-4); Rec. Doc. 42-2, pp. 47, 57-58.
[54] *Id.*

towing rotation list, Plaintiffs contend Officer Dennis did not advise State Police that Defendant intended to "pre-select" companies "not [] based on any legally permissible criteria."[55]   Plaintiffs cite the deposition testimony of Officer Dennis, who testified that Chief Jackson gave him names of tow companies he wanted on Defendant's list prior to the initiation of any application process.[56]  Officer Dennis affirmed that the five companies Chief Jackson selected for Defendant's list were selected without completing applications beforehand.[57]

Plaintiffs claim the five towing companies were selected because they are politically affiliated with Chief Jackson or have done personal favors for him.  Plaintiffs cite the Declaration of Frank Credidio ("Credidio"), manager of Ascension Towing and Recovery, LLC, a company that is on Defendant's list.[58]  Credidio attests that he was told by Chief Jackson that his company would be added to Defendant's towing rotation list "because [he] assisted towing [Chief Jackson's] personal equipment out of a ditch" free of charge.[59]   Credidio also attested that, each year, his company is "preselected to participate on the towing rotation list by Chief Jackson" before he completes and submits reapplications for the new year.[60]

Ball was told by Chief Ambeau, who heard from his cousin, Floyd Russo, Jr., owner of American Towing, that Chief Jackson said "whoever supports me is going to be on my

---

[55] Rec. Doc. 42, p. 3.
[56] Rec. Doc. 42-3, pp. 25-27, 33-37.
[57] *Id.*
[58] Rec. Doc. 42-17.
[59] *Id.* at ¶¶ 3-5.
[60] *Id.* at ¶ 6.

list."[61]  Based on this information, Ball initially donated to Chief Jackson's first campaign;[62] however, he stopped supporting Chief Jackson financially after Chief Jackson allegedly sent Ball's girlfriend a sexually inappropriate message in 2013 prompting Ball to confront Chief Jackson publicly in a restaurant.[63] After this confrontation, Ball was told by Chief Ambeau that Chief Jackson was embarrassed by Ball in public."[64]  Ball also testified that he was told by Officer Dennis that he "was never getting on the list" because of this confrontation.[65]  Ball spoke to his uncle about the situation, and Ball's uncle asked Chief Jackson why Ball's company was not on the list; Ball's uncle advised Ball that Chief Jackson stated that it was because did not "get to be with [Ball's] woman," and because Ball embarrassed him in public.[66]

Plaintiffs cite Chief Jackson's Campaign Finance Disclosures which show that Corey Fisher ("Fisher"), initially the owner of Fisher's Towing, contributed to Chief Jackson in 2012, 2013, 2015, and 2016.[67]  Ball testified that Fisher told him he would perform various services for Chief Jackson and the police department, including hauling Chief Jackson's personal equipment, outfitting police units, and writing higher estimates for police unit repairs so Chief Jackson and the police department would receive better/newer vehicles.[68]  The new owners of Fisher's Towing, Melissa and Jessie James, are politically affiliated with the City of Gonzales Police Department.  Lieutenant Lance

---

[61] Rec. Doc. 39-4, pp. 74-75. Plaintiffs' counsel makes the disingenuous statement that Chief Jackson "admitted" this to Ball; however, this statement was delivered by a third-party who still lacked direct knowledge, and it is hearsay.
[62] Rec. Doc. 39-4, p. 76.
[63] *Id.* at pp. 82-88.
[64] *Id.* at p. 88.
[65] *Id.* at p. 91.
[66] *Id.* at pp. 91-92.
[67] Rec. Doc. 42-6.
[68] Rec. Doc. 39-4, pp. 72-73.

Bourgeois ("Lt. Bourgeois") testified that he and his wife are personal friends of the Jameses, and they have often socialized together.[69]  Additionally, Palmer testified that he was told that Fisher Towing funded a party for graduates of the City of Gonzales Police Department.[70]

Plaintiffs claim the preselection of companies for Defendant's towing rotation list violates Louisiana law, specifically LAC 55, Chapter 19, Subchapter A, Section 1947(D), which requires that any entity seeking to be on a municipality's towing rotation list must be afforded the opportunity to submit an application.  Plaintiffs refer back to Officer Dennis' testimony wherein he admitted that the five companies on Defendant's list were selected before they applied, and their applications were only completed after they had already been chosen.[71]  Further, Section 1947(D)(2) requires the Defendant to "review" and "determine" whether the towing company applicants are eligible to be on the list, which could not have happened since Chief Jackson chose these companies without reviewing any applications.  Officer Dennis testified that Action Towing was placed on the list at Chief Jackson's direction and without submitting an application; Dennis himself hand-delivers or emails the applications to the five companies every renewal year, and they are then returned to or picked up by Officer Dennis.[72]

Plaintiffs contend Chief Jackson has admitted that he does not follow the legal process in making the towing rotation list selections because he could not confirm if he had reviewed the 2022 or 2023 applications;[73] Chief Jackson stated:

---

[69] Rec. Doc. 42-7, pp. 21-23.
[70] Rec. Doc. 42-2, pp. 87-88.
[71] Rec. Doc. 42-3, pp. 27, 33-34.
[72] *Id.* at pp. 47-48.
[73] Rec. Doc. 42-4, pp. 68, 110.

Like I said before, it was all under my discretion.  I told Tyson, you know, the wreckers that I wanted.  He said that Ascension Towing had the eighteen-wheeler wrecker, and he would like to see them on there … I think I was the one to call the wreckers, and the ones that I chose, and told them what was going on and when it was going to start.  Nobody knew anything except for me and Tyson.  The Police Department did not know.  The Sheriff knew, but that was about it."[74]

Chief Jackson was asked: "So nobody knew, including my clients, that the City of Gonzales was creating a separate towing rotation list other than, as you said, the Sheriff, yourself, Mr. Dennis, and then the five entitles that you had selected?" to which he responded, "Correct."[75]

The Defendant issued Gonzales Police Department Procedure 501 "Vehicle Towing" and Procedure 503 "Vehicle Towing Procedures" purporting to establish policy and procedures relating to towing vehicles.[76] Captain Stephen Nethken ("Cpt. Nethken") of the Gonzales Police Department assisted with the drafting of the policy; he testified that he heavily plagiarized the State Police policy, and he also included certain items that Chief Jackson wanted in the policy.[77]  Cpt. Nethken acknowledged, as the writer of the policy, that the State Police application process was incorporated into Defendant's policy by referencing Title 37.[78]  Cpt. Nethken agreed that, if the five companies were preselected without ever submitting an application, that would be a violation of state law and Gonzlaes Police Department policy.[79]

When Ball learned of this pre-selected towing rotation list in late 2021, and that his company Gonzales Towing was not on the list,[80] he asked Officer Dennis about getting

---

[74] *Id.*at p. 115:10-116:2.

[75] *Id.* at p. 117:3-8.

[76] *See* Rec. Doc. 42-3, Exhibit 5 (CM/ECF pp. 31-35).

[77] Rec. Doc. 42-8, pp. 20-21.

[78] *Id.* at pp. 22-24.

[79] *Id.* at p. 24.

[80] Rec. Doc. 39-4, pp. 23-24.

on the list, and Officer Dennis told Ball that he would never get on Chief Jackson's list.[81]

Ball admitted that Officer Dennis did not tell him he could not apply, but Ball interpreted

Officer Dennis' response to say that it would make no difference if Ball applied because

Chief Jackson "specifically blackballed [his] business."[82]  Additionally, Officer Dennis

confirmed that the application process involved Officer Dennis delivering the applications

to the companies Chief Jackson wanted; thus, because Ball was never provided an

application, he believes he was excluded from applying.[83]

Initially, Palmer heard from the owners of Tullier's Towing and Fisher's Towing that

his company would be on Defendant's towing rotation list.[84]  Despite this, weeks passed,

and Southern Towing was not on the list.[85]  Palmer attempted to contact Chief Jackson

and others in the Gonzales Police Department, but no one returned his calls.[86]  Palmer

testified that he was later told by Foster that Southern Towing's spot on the list had been

"bought by somebody else," and Foster believed this was Ascension Towing.[87]

On February 8, 2022, Palmer and Ball participated in a meeting with other area

towing companies that was led by Officer Dennis.  During this meeting, Officer Dennis

advised those in attendance that the City of Gonzales was unilaterally implementing a

towing rotation list, limited to five towing companies, and Plaintiffs were excluded from

participating in the towing rotation list.[88]  Following this meeting, Plaintiffs inquired how

they could get on Defendant's list; Officer Dennis purportedly advised Palmer that there

---

[81] *Id.* at p. 65.
[82] *Id.*
[83] *Id.* at pp. 80-81.
[84] Rec. Doc. 42-2, pp. 41-42, 46.
[85] *Id.* at pp. 42-43.
[86] *Id.* at p. 43.
[87] *Id.* at p. 46.
[88] Defendant admits this fact.  Rec. Doc. 39-4, pp. 147-148; Rec. Doc. 39-6, pp. 31-34.

was no point in applying because Southern Towing would never get on the list.[89]  When

Ball had an attorney contact Officer Dennis to apply for Defendant's list, Officer Dennis

purportedly refused Ball's application and advised that Ball needed to "advertise more"

because he was "never getting on the list."[90]  Chief Jackson purportedly advised Palmer

that Southern Towing was left off the list because he was unaware of its existence;[91] Chief

Jackson purportedly later told Ball that he [the Chief] could do whatever he wanted and

could not be "touched."[92]

Ball and Palmer subsequently met with Sheriff Webre to discuss Defendant's

towing rotation list; both Ball and Palmer claim Sheriff Webre advised them that neither

of their companies would ever be on Defendant's list so long as Chief Jackson was the

chief, and Sheriff Webre purportedly told them Chief Jackson's actions were illegal and

they should sue.[93]

Plaintiffs maintain that this process is illegal and continues to be carried out, year

after year, without providing Plaintiffs an opportunity to apply for the Defendant's list.

During the summer of 2023, the owner of Carter's Towing passed away, and the business

ceased operations.  Despite this, Plaintiffs were never given an opportunity to apply for

the vacancy; rather, Chief Jackson preselected Action Towing to replace Carter's without

first receiving an application from Action Towing or determining whether Action was

qualified under the law.[94]

---

[89] Rec. Doc. 39-6, p. 34.
[90] Rec. Doc. 39-4, p. 91.
[91] Rec. Doc. 39-6, pp. 83-84.
[92] Rec. Doc. 39-4, pp. 78, 136-137.
[93] Rec. Doc. 39-6, pp. 38-89; Rec. Doc. 39-4, pp. 69-71.
[94] Rec. Doc. 39-6, pp. 78-80; Rec. Doc. 39-6, pp. 60-61, 133-135; Rec. Doc. 42-3, pp. 46-47, 103-104.

Further, citing to the deposition testimony of Tyson Dennis and Sheriff Jackson, Plaintiffs claim the Defendant continues to simply "piggyback" off the State Police list without undertaking its own efforts to review and determine that the companies selected comply with all applicable laws and regulations.[95]    Plaintiffs contend that all towing companies on the current list are non-compliant with applicable law and regulations in various ways; yet, Defendant refuses to enforce the law and remove them from the list.[96]

For example, Tullier's Towing stores over 100 towed vehicles outside a fence or other physical barrier in violation of LAC 55, Chapter 19, Subchapter A.[97]   Although this violation can be easily observed by passing the business, Chief Jackson claimed he was unaware of this violation until his deposition;[98] Chief Jackson nevertheless believes he has the discretion to determine whether a violating company mut be removed from the list.[99]   Plaintiffs also claim that, pursuant to City Ordinance 22-3, Fisher's Towing yard is located in a residential zone, rendering it ineligible to be on Defendant's list.[100]   Like Tullier's Towing, American Towing also stores towed vehicles outside of a fence or other barrier, in violation of applicable laws and regulations.[101]   In fact, in November 2022, American Towing was suspended for a brief time from the State Police towing rotation list (and thus, also from Defendant's towing rotation list) for this violation; yet, Plaintiffs were never given an opportunity to apply for this vacancy during American Towing's suspension.[102]   Chief Jackson testified that, while he did not know why American Towing

---

[95] Rec. Doc. 42-3, pp. 58, 62-63, 73-74; Rec. Doc. 42-4, pp. 44-46.
[96] Rec. Doc. 42, pp. 11-15.
[97] Defendant admits this fact. Rec. Doc. 42-5, pp. 8-14, 42-43, 47-48, 59-75 & Exhibit 2 (CM/ECF pp. 32-36).
[98] Rec. Doc. 42-4, p. 91-92.
[99] *Id.* at pp. 148-149.
[100] Defendant admits this fact.
[101] Defendant admits this fact.
[102] Rec. Doc. 42-4, p. 50, 73, 75.

was suspended, he would normally "be fair and give people time to get into compliance."[103]  Ball claims that Ascension Towing sells dismantled vehicle parts to non-licensed dismantlers, but this claim in not supported by any evidence other than Ball's belief.[104] Finally, Action Towing's storage yard is located within a commercial zone rather than an industrial zone in violation of City Ordinance 22-3, yet Ascension Towing remains on the list and is routinely preselected each year.[105]

Plaintiffs contend Defendant monopolized the towing industry in the City of Gonzales, and this caused Plaintiffs significant financial loss.  Palmer testified that, after Defendant implemented its list, he lost approximately seven to ten tows per week within the City of Gonzales.[106] Ball testified that his business went from "a couple of calls a day from the sheriff's office, then we went to one call a week."[107] Plaintiffs argue their loss amount can be calculated using Defendant's accident reports showing the number of callouts and that "[m]ultiplying the potential income for each tow times the number of tows they lost demonstrates their financial loss."[108]  Plaintiffs claim these accident reports were sought in discovery but not produced by Defendant.

Plaintiffs filed this lawsuit seeking declaratory and injunctive relief; they ask the Court to declare Defendant's Vehicle Towing Procedure unlawful based on the "practice of excluding qualified tow companies from participation on the rotational list on account of political affiliation."[109] Plaintiffs also assert a claim of First Amendment retaliation for

---

[103] *Id*. at p. 73.
[104] Rec. Doc. 39-4, pp. 138-140
[105] Defendant admits this fact. Rec. Doc. 42-15, pp. 41-43.
[106] Rec. Doc. 42-2, pp. 47, 57-58.
[107] Rec. Doc. 39-4, p. 103.
[108] Rec. Doc. 42, p. 15.
[109] Civil Action No. 23-473-SDD-RLB, Rec. Doc. 1-2, p. 6.

political speech/association and violations of Louisiana antitrust statutes. Defendant moves for summary judgment on all claims.

## II.    LAW AND ANALYSIS

### A.  Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[110] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[111] A court must deny the motion for summary judgment if the movant fails to meet this burden.[112]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[113] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[114] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[115]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[116] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that

---

[110] Fed. R. Civ. P. 56.
[111] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[112] *Id.*
[113] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[114] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir 1990) (citing *In re Mun. Bond Rep. Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)).
[115] *Anderson*, 477 U.S. at 249 (citations omitted).
[116] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

party's favor.[117] Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[118]

### B.  Declaratory Relief – Gonzales Police Department Procedure 503

The Louisiana Towing and Storage Act ("the Act"), La. R.S. 32:1711 *et seq.*, outlines the procedure for the creation and maintenance of a tow rotation list that is used when a vehicle must be towed from a roadway.[119] It provides:

A.  When a law enforcement officer determines that a motor vehicle must be towed, the law enforcement officer shall give the owner or operator of the motor vehicle the option to select a licensed towing company to tow his vehicle. If the owner or operator of the motor vehicle is unable to select a licensed towing company, chooses not to select a particular licensed towing company, or an emergency situation requires the immediate removal of the vehicle, the next available licensed towing company on the approved law enforcement rotation list shall be called by the law enforcement officer to tow the vehicle.

B.  The towing company selected by the owner or operator of a motor vehicle or the law enforcement officer shall be allowed to respond to the call within forty-five minutes. If the towing company fails to respond within forty-five minutes, the law enforcement officer may select the next available towing company from the approved rotation list.[120]

The Act also provides that "[l]aw enforcement agencies may establish a rotation list of towing companies with tow trucks licensed in accordance with the provisions of R.S. 32:1716."[121] To be eligible, a tow truck company must be properly certified, possess the requisite permits, and operate within the regulatory structure outlined by the Louisiana Public Service Commission.[122] The tow company must also comply with the standards, rules, and procedures outlined by the Department of Public Safety and Corrections, Office

---

[117] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[118] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[119] *See* La. R.S. § 32:1735.
[120] La. R.S. § 32:1735.
[121] La. R.S. § 32:1735(C).
[122] *Id.* (citing La. R.S. 45:164 and 180.1).

of State Police to be accepted as a viable participant on the rotation list.[123] Finally, the Act prohibits law enforcement from recommending a specific tow company to conduct a tow.[124] Rather, unless the vehicle owner exercises their option to select a towing company, all tows must be referred to the rotation list.

Defendant painstakingly demonstrates how its policy was formulated pursuant to the appliable statutes and regulations.  Citing LAC 55, Chapter 19, Section 1947(A)(2), Defendant emphasizes the discretion afforded law enforcement in selecting towing companies for its list and argues "[t]his affirmative granting of discretion cannot co-exist with a holding that the City of Gonzales did not have the discretion to choose the towing companies it thought would best serve the City, and further, that the City is required to include these plaintiffs on its towing rotation list."[125] Defendant cites case law holding that "the establishment of a rotation list is discretionary and not mandatory and that the participation in the rotation list is at the discretion of the law enforcement agency."[126] Defendant maintains Plaintiffs' "interest in being included on the towing rotation list is nothing more than a unilateral expectation."[127]   Defendant claims that, because it "exercised validly granted discretion," it is entitled to summary judgment on Plaintiffs' request to declare its Vehicle Towing policy invalid.

Plaintiffs argue Procedure 503.10 fails to comply with the statutes and regulations because:

---

[123] *Id.*
[124] La. R.S. § 32:1735(D).
[125] Rec. 39-2, pp. 20-21 (pp. 15-16 of brief).
[126] *Id.* at p. 21 (p. 16 of brief)(quoting *Arnaud v. Dies*, 2016 La. Dist. LEXIS 10536, *1); *see also* Rec. Docs. 39-16, 39-17.
[127] *Id.*

(1) each towing company seeking to participate on defendant City's towing rotation list must submit an application "on the approved departmental forms";

(2) defendant City must "review" the application and determine if the application and towing company "complies" with La. R.S. 32:1711, et seq., and LAC 55;

(3) defendant City cannot "authorize[]" participation on the towing rotation list if the applying towing company does not "meet the operational requirements" of La. R.S. 32:1711, et seq., and LAC 55; and

(4) defendant City and the approved towing company execute a "contract" approved and provided by the department.[128]

Plaintiffs maintain that, although Procedure 503.10 appears to adopt LA. R.S. 32:1711 and LAC 55, none of the requirements of Section 1947(D) were met when Defendant's list was created.   Plaintiffs claim the companies who made the list were arbitrarily preselected, without proceeding through an application (or reapplication) vetting process, based purely on "political loyalty, affiliation, and favors."[129]  Further, the companies selected were allowed to be on the list despite their noncompliance with the applicable statutes and regulations.  Simply put, Plaintiffs do not dispute Defendant's legal authority to create a towing rotation list, but they contend Defendant does not have the authority or discretion to ignore the legal requirements when implementing procedures.

The Court finds summary judgment improper on the current record.  The applicable laws and regulations make clear that a municipality may form its own towing rotation list in a manner that complies with said laws and regulations.  It is also understood that law enforcement has broad discretion in managing said list. Defendant contends that, because it has "piggybacked" off the State Police policy and procedure for implementing and managing its towing rotation list, and State Police sets the minimum standards to be followed, Defendant's policy must be lawful since it essentially mirrors that of the State

---

[128] Rec. Doc. 42, pp. 18-19.
[129] *Id.* at p. 19.

Police.   Nevertheless, there are genuine issues of material fact about whether the Defendant has in fact complied with its own policy.

First, the Court is unpersuaded that Defendant bears no legal obligation to determine that its selected towing companies are in compliance with Louisiana laws and regulations.  Defendant's position is that the statute allows them to do whatever State Police has done; thus, if State Police suspends, Defendant suspends, and if State Police has a company on the list, Defendant can select that company without any independent investigation.  Defendant admits that certain companies on its towing list are in technical violation of the applicable laws and regulations; however, there is nothing before the Court that explains why Defendant or State Police have allowed violators to remain on their lists.

Second, both Officer Dennis and Chief Jackson testified that the towing companies on the list were selected before Procedure 503.10 was promulgated and without any application submission or vetting process.[130]   Cpt. Nethken, who largely assisted in drafting Defendant's policy, testified that he heavily plagiarized the State Police policy and added details specifically requested by Chief Jackson.  Although Cpt. Nethken is not a lawyer or competent to give legal opinions, he agreed that, if the five companies were preselected without ever submitting an application, that would be a violation of state law and Gonzales Police Department policy.[131]

Third, the Court does not quibble with the considerable discretion that Louisiana laws and regulations afford law enforcement in creating towing rotations lists, but even Defendant agrees that the Government may not "punish protected speech" or political

---

[130] Rec. Doc. 42-3, pp. 25-27, 33-37; Rec. Doc. 42-4, pp. 68, 110, 115-117.
[131] *Id.* at p. 24.

association.[132]   Because there are genuine disputes of material fact as to whether Plaintiffs' political speech/association played a role in their exclusion from Defendant's list, discussed in greater detail below, the Court finds that summary judgment is improper on Plaintiffs' claim for declaratory relief.

### C. First Amendment Retaliation – Political Speech/Affiliation

The Civil Rights Act of 1964, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law.[133] It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....[134]

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"[135] To prevail on a § 1983 claim, a plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.[136]

A municipality may be subject to liability under § 1983 when the municipality maintains an unconstitutional policy or custom.[137] To state a claim against a municipal

---

[132] *McHugh v. St. Tammany Parish*, No. 24-1300, 2024 WL 3509561, at *11 (E.D. La. July 23, 2024)(citing *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004)).

[133] *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19 (1981).

[134] 42 U.S.C. § 1983.

[135] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Jackson v. City of Atlanta*, 73 F.3d 60, 63 (5th Cir. 1996); *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir. 1985).

[136] *See Blessing v. Freestone,* 520 U.S. 329, 340 (1997); *Daniels v. Williams,* 474 U.S. 327, 330 (1986); *Augustine v. Doe*, 740 F.2d 322, 324–25 (5th Cir. 1984).

[137] *Valle v. City of Houston*, 613 F.3d 536, 541-542 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

defendant for an alleged unconstitutional policy or practice, the plaintiff must allege that (1) an official policy (2) promulgated by a policymaker (3) was the moving force behind the violation of a constitutional right.[138] It is undisputed that Procedure 503.10 is an official policy promulgated by Chief Jackson, the policymaker for the City of Gonzales.  Whether Plaintiffs suffered a constitutional violation, and whether this policy was the moving force behind the alleged violation, are disputed issues of fact.

An independent contractor can state a First Amendment claim for having a public contract terminated or not renewed because of political speech/association. The seminal cases from the Supreme Court are *O'Hare* and *Umbehr*, decided by the United States Supreme Court on the same day.[139]  In *Delahoussaye v. Livingston Parish, La.*,[140] this Court previously summarized the Supreme Court's holding in *O'Hare*:

> In *O'Hare Truck Service, Inc., et al. v. City of Northlake*, the owner and operator of a tow truck service sued the City of Northlake for retaliation under the First Amendment when his company was removed from the rotation list of available towing companies for failure to support the incumbent mayor's re-election campaign.[141]  In *O'Hare*, the Supreme Court recognized the deep-rooted distinction between employees and independent contractors in our legal tradition.  Nevertheless, the Court found no reason why First Amendment protections "should turn on the distinction, which is, in the main, a creature of the common law of agency and torts."[142]  The *O'Hare* Court, relying on another Supreme Court decision rendered the same day addressing First Amendment rights and independent contractors, stated:  "A rigid rule 'giv[ing] the government carte blanche to terminate independent contractors for exercising First Amendment rights … would leave [those] rights unduly dependent on

---

[138] *Hicks–Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) (citations omitted).

[139] *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668 (1996) (First Amendment protects independent contractors from termination or prevention of automatic renewal of at-will government contracts in retaliation for their exercise of freedom of speech.); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) (Private towing service that alleged that it was removed from city's rotation list of available towing service contractors, contrary to longstanding practice of removing contractors from list only for cause, because its owner refused to contribute to mayor's reelection campaign, and instead supported his opponent, stated claim against city under First Amendment.)

[140] No. 12-00481-SDD-SCR, 2014 WL 4538074, *5 (M.D. La. Sep. 11, 2014).

[141] *O'Hare Truck Service, Inc.* at 722.

[142] *Id.*

whether state law labels a government service provider's contract as a contract of employment or a contractor for services, a distinction which is at best a very poor proxy for the interests at stake."[143]  It was the Court's concern that reliance on such a distinction in assessing such constitutional claims "would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs."[144]   Ultimately, the Court "decline[d] to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees."[145]

As the Supreme Court has explained, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest—especially, his interest in freedom of speech."[146] The Supreme Court has "extended" that principle outside the employment context, "to government retaliation against a contractor or a regular provider of services for the exercise of rights of political association and the expression of political allegiance."[147]

In *Garzes v. S. San Antonio Indep. Sch. Dist.*,[148] the court noted that, if the issue is whether a government actor infringed on someone's freedom of speech, the court uses the tests established in *Pickering v. Board of Education* and *Connick v. Myers*.[149] If the case arises outside of the public employment context, the court uses the standard enunciated in *Perry v. Sinderman*.[150]  Under the *Perry* standard, a plaintiff must establish

---

[143] *Id.* at 721 (quoting *Board of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S., at 679).

[144] *Id.* at 722.

[145] *Id.* at 726.

[146] *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

[147] *Colson v. Grohman*, 174 F.3d 498, 509 (5th Cir. 1999).

[148] No. SA-02-CA-1131-FB, 2004 WL 7337262 (W.D. Tex. Aug. 13, 2004), *report and recommendation adopted*, 2004 WL 7337265 (W.D. Tex. Sept. 14, 2004).

[149] *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983)).

[150] *Id.* (citing *Blackburn v. City of Marshall*, 42 F.3d 925, 932 (5th Cir. 1995)).

that: "(1) he engaged in constitutionally protected activity; (2) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct; and (3) the defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity."[151] The court explained that, "[u]nder the first prong, constitutionally protected activity or speech is that related to any matter of 'political, social, or other concern to the community.'"[152] As to political association, "[t]he First Amendment broadly protects two types of association: (1) the choice to enter and maintain certain intimate familial relationships and (2) association for engaging in other activities protected by the First Amendment, such as speech, religion, or redress of grievances."[153]

The failure to support a political candidate is also protected by the Constitution.  It is well established in the Fifth Circuit that "the *Elrod-Branti* doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party."[154] In establishing a constitutional violation, a plaintiff must demonstrate that the termination was politically motivated.[155] "Cases finding impermissible patronage terminations involve either an employee's allegiance to a political party, a political candidate, or a political belief."[156]

---

[151] *Id.* (citing *Keenan,* 290 F.3d at 258).

[152] *Id.*

[153] *Garcia v. San Benito Consol. Indep. Sch. Dist.*, No. 1:21-cv-20, 2022 WL 19830659 (S.D. Tex. Nov. 14, 2022), *report and recommendation adopted*, 2023 WL 2987563 (S.D. Tex. Apr. 18, 2023), *reconsideration denied*, 2023 WL 4494396 (S.D. Tex. June 12, 2023), and appeal dismissed, 2024 WL 3385179 (5th Cir. Feb. 15, 2024).

[154] *McBee v. Jim Hogg Cnty.*, 703 F.2d 834, 838 n.1 (1983) (emphasis added), *vacated on other grounds*, 730 F.2d 1009 (1984) (*en banc*); *see Jordan v. Ector Cnty.*, 516 F.3d 290, 295-96 & n.17 (5th Cir. 2008) (discussing and collecting Fifth Circuit cases; *Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988). *But see Correa v. Fischer*, 982 F.2d 931, 935 (5th Cir. 1993) (distinguishing *McBee, Matherne*, and other similar cases because they all involved "terminations of employees who supported a particular candidate in an electoral battle" from the *Correa* fact pattern, which involved a personal rather than political rivalry).

[155] *Correa*, 982 F.2d at 933.

[156] *Id.* at 934.

Long-standing First Amendment jurisprudence demonstrates that speech "extends to many activities that are by their very nature non-verbal: an artist's canvas, a musician's instrumental composition, and a protestor's silent picket of an offending entity are all examples of protected, non-verbal 'speech.'"[157] Nevertheless, not all silence is entitled to First Amendment protection. The Fifth Circuit requires that "there must be some outward manifestations of the allegedly protected First Amendment activity."[158]

The First Amendment also protects against compelled speech. There "is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."[159]

However, the Fifth Circuit has expressly held that "[t]he First Amendment protects an employee's loyalty towards a political party, a candidate, or a belief, **but not a personal rival**."[160] Indeed, "a personal enmity does not necessarily involve a political rivalry. To violate the First Amendment, the termination must involve a *political*, motivation. A termination arising from a personal feud or from no cause at all may be baleful, but it is not a patronage dismissal in violation of the First Amendment."[161] The Fifth Circuit acknowledged that "[d]istinguishing between the casualties of political and personal battles may be a difficult undertaking in particular cases."[162]

---

[157] *Steadman v. Tex. Rangers*, 179 F.3d 360, 367 (5th Cir. 1999) (citing various U.S. Supreme Court First Amendment cases).
[158] *Jordan*, 516 F.3d at 298.
[159] *Riley v. Nat'l Federation of the Blind of N.C.*, 487 U.S. 781, 796–97 (1988)(emphasis in original).
[160] *Correa*, 982 F.2d at 935 (emphasis added).
[161] *Id.* (emphasis in original).
[162] *Id.* at 935-936.

Under the foregoing legal backdrop, the Court turns to the Parties' arguments. Defendant maintains Plaintiffs' First Amendment claims fail because the summary judgment evidence undermines Plaintiffs' claims. First, as to Gonzales Towing, Ball *did* donate to Chief Jackson's first campaign, and Gonzales Towing was still not selected to the list. As to Southern Towing, while Palmer believes his "spot" was "bought" by another towing company, Chief Jackson testified that he was unaware of the company's existence at the time the list selections were made. Further, Defendant argues Plaintiffs have failed to point to any constitutionally protected speech that caused them to be left off the list.

Plaintiffs contend they have submitted sufficient summary judgment evidence to demonstrate genuinely disputed material facts regarding their First Amendment retaliation claims. Plaintiffs point to their own testimony, Officer Dennis' testimony, and Credidio's attestations. Plaintiffs claim that the evidence of preselected towing companies without abiding the legally required application process is a pretext for First Amendment retaliation. Further, Plaintiffs contend the evidence shows that the selected towing companies were chosen because their owners supported Chief Jackson's campaign(s) and/or performed personal favors for him.

Considering the relevant laws and jurisprudence that govern this claim and the summary judgment evidence submitted by the parties, the Court finds that there are genuine issues of material fact that preclude summary judgment on this claim. Defendant is correct that, if Chief Jackson made his selections based on permissible grounds, such as the performance capacities of each company, geographic location, etc., Plaintiffs cannot recover under the First Amendment. It is also true that, even if Chief Jackson bore some personal dislike towards Plaintiffs' owners, Plaintiffs cannot recover under the First

Amendment.    "To violate the First Amendment, the termination must involve a political motivation."[163]    For example, the altercation between Chief Jackson and Ball about inappropriate comments to Ball's girlfriend is not evidence that supports a First Amendment retaliation claim; rather, it is only evidence of "personal enmity" that appears unrelated to politics. But Plaintiffs have submitted summary judgment evidence that suggests political motivations *may* have played a role in Chief Jackson's selections.  It is for the jury to make these credibility determinations, not the Court at the summary judgment stage.

The Court finds the following genuinely disputed material facts on this claim:

1) Whether Chief Jackson properly exercised his discretion in implementing the City's Procedure 503.10, considering both he and Officer Dennis admit that the towing companies were preselected,[164] and the application process was not enforced, or whether this process was circumvented to award spots on the list to Chief Jackson's political supporters and friends.

2)  Whether the suggestions purportedly made by Ascension Parish Sheriff Bobby Webre were delivered on behalf of Chief Jackson or based on personal knowledge that Webre possessed about Chief Jackson's motivations.

3) Whether Credidio credibly attested that he was selected by Chief Jackson based on personal favors Credidio's company performed for him;[165]

4) Whether Chief Jackson said that his list would be comprised of only those that supported him politically, a message delivered to Ball by Chief Ambeau, who allegedly obtained this information from his cousin who owns American Towing.[166]

5) Whether all companies selected for the list contributed to Chief Jackson politically or personally.[167]

6) Whether Southern Towing's "spot" on Defendant's list was "bought by somebody else."[168]

---

[163] *Reyes v. Salazar*, No. SA:18-CV-470-JKP, 2020 WL 4018597, *8 (W.D. Tex. July 15, 2020) (citing *Correa*, 982 F.2d at 933).
[164] Rec. Doc. 42-3, pp. 25-27, 33-37, 47-48; Rec. Doc. 42-4, pp. 68, 110115-116
[165] Rec. Doc. 42-17.
[166] Rec. Doc. 39-4, pp. 74-75.
[167] Ball testified that Darryl Tullier, owner of Tullier's Towing, donated to Chief Jackson; Darryl Tullier testified that he has never donated to Chief Jackson.
[168] Rec. Doc. 42-2, pp. 41-43, 46.

7) Whether Officer Dennis advised Plaintiffs that their companies "would never get on the list,"[169] and if so, whether the sentiment was politically motivated.

8) Whether Plaintiffs suffered damages as a result of being excluded from the towing rotation list; if so, whether those damages were caused by Defendant's conduct.

The Court must note that the bulk of summary judgment evidence offered by Plaintiffs is hearsay.  But the Court can consider hearsay statements at the summary judgment stage "if the statement[s] can be reduced to admissible evidence at trial or reduced to admissible form."[170] "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."[171] Accordingly, Defendant's motion for summary judgment on Plaintiffs' First Amendment retaliation claims is DENIED.

### D.  Louisiana Antitrust Statutes

Despite Plaintiffs' desperation to be on Defendant's towing rotation list, and the fact that they are or have been on other towing rotation lists, they shift course and allege Defendant's list and process violates Louisiana's antitrust statutes by unlawfully restricting the market and creating a monopoly.   Specifically, Plaintiffs contend Defendant's towing rotation policy creates an illegal combination in restraint of trade or commerce in violation of La. R.S. 51:122 and an illegal monopoly of trade in violation of R.S. 51:123.

As noted by the district court for the Western District of Louisiana:

The number of reported decisions interpreting Louisiana's antitrust statutes is relatively limited compared to federal antitrust jurisprudence. In determining whether the conduct at issue violates the state antitrust laws, the Court will rely in part on legal standards developed under federal

---

[169] Rec. Doc. 39-4, pp. 147-148; Rec. Doc. 39-6, pp. 31-34.
[170] *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), as revised (July 5, 2017).
[171] *Ali v. Dist. Dir.*, 209 F. Supp. 3d 1268, 1276 (S.D. Fla. 2016).

jurisprudence. Louisiana's antitrust statutes closely resemble the provisions of the Sherman Act, 15 U.S.C. § 1, et al., and "the concerns which spurred the enactment of the federal Sherman Antitrust Act are the same as those which influenced Louisiana's adoption of virtually identical legislation." *Reppond*, 572 So.2d, at 228. Federal jurisprudence interpreting the Sherman Act may be used as persuasive interpretation of the state statute. *Louisiana Power & Light v. United Gas Pipe Line*, 493 So.2d 1149 (La.1986).[172]

### 1.  La. R.S. 51:122 Unreasonable Restraint of Trade

The purpose of § 1 of the Sherman Act is to prohibit only unreasonable restraints of trade.[173]   Whether concerted action violates § 1 of the Sherman Act is ordinarily determined "through case-by-case application of the so-called rule of reason—that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'"[174] This rule of reason is applied in all cases except those where the challenged conduct "is so manifestly anticompetitive that it constitutes a *per se* violation of the Act."[175] Plaintiffs do not appear to allege a *per se* violation.

In rule of reason cases with a private defendant, the relevant question is whether "the anticompetitive consequences" of the challenged action "outweigh their legitimate business justifications."[176] Where the case involves a municipal defendant acting in the public interest, as here, "the rule of reason inquiry is whether any anticompetitive consequences outweigh public benefits."[177] Here, "anticompetitive" refers "not to actions that merely injure individual competitors, but rather to actions that harm the competitive

---

[172] *Giddens v. City of Shreveport*, 901 F.Supp.1170, 1179 (W.D. La. 1995).
[173] *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 723 (1988).
[174] *Id*. (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).
[175] *Giddens*, 901 F.Supp. at 1179-1180 (citing *Business Electronics*, 485 U.S. at 723).
[176] *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478 (1st Cir.1988).
[177] *Giddens*, 901 F.Supp. at 1180.

process."[178] "[T]he rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market—a concerted attempt to ... reduce consumer welfare."[179] "Accordingly, a showing that the defendants harmed the plaintiffs is not enough to prove a violation of section 1 under the rule of reason."[180]

Defendant contends Plaintiffs' restraint of trade claim fails for several reasons. First, La. R.S. 51: 122 requires a plaintiff to allege that a defendant is a party to a contract that results in an unreasonable restraint of trade.[181]  There is no contract between Defendant and any towing companies.  Participation in a towing rotation list does not create any obligation of performance because, when a dispatcher connects with a towing company, the towing company is free to accept or refuse the tow.[182] Second, Plaintiffs' claims fail because Defendant had the legal authority to implement a towing rotation list, it had State Police approval of its list, and towing vehicles in the City is a legitimate public policy consideration.  Defendant has not violated this statute "[s]ince the towing rotation list is not a restraint of trade (but merely a referral list) and is not unreasonable."[183]  Finally, Defendant is not a private entity and has no authority over private companies to dictate what rates they charge their customers.

In opposition, Plaintiffs ignore several of Defendant's arguments on the restraint of trade claim.  Plaintiffs do, however, point out that the existence of a contract is not required by the statute; rather, the existence of a conspiracy will suffice.[184] Plaintiffs focus almost

---

[178] *Clamp–All Corp*, 851 F.2d at 486.
[179] *Consolidated Metal Products v. American Petroleum Institute*, 846 F.2d 284, 293 (5th Cir.1988).
[180] *Id.*
[181] *Reppond v. City of Denham Springs*, 572 So.2d 224, 230 (La. App. 1 Cir. 1990).
[182] Rec. Doc. 39-6, pp. 29-30.
[183] Rec. Doc. 39-2, p. 31 (p. 26 of brief).
[184] *See John River Cartage, Inc. v. Louisiana Generating, LLC*, 2020-0162 (La. App. 1 Cir. 3/4/20, 300 So.3d 437, 448-449.

entirely on the same arguments made in support of their First Amendment claim and argue in conclusory fashion that Defendant's list "unlawful[ly] restrains towing in the City of Gonzales in favor of only those towing companies that defendant favors."[185]

2. La. R.S. 51:123 Monopoly

Louisiana Revised Statute 51:123 prohibits monopolization of trade or commerce through language which tracks § 2 of the Sherman Act. This statute provides, in part, that "[n]o person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state." "Monopoly power exists where prices can be raised above the levels that would be charged in a competitive market. To establish a claim for monopoly, a plaintiff must establish that: (1) the defendant possessed monopoly power in a clearly defined economic and geographic region (the relevant market); and (2) the defendant had the specific purpose or intent to exercise or maintain that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[186] Importantly,

> Monopoly power is defined as the ability to control prices or to exclude competition from the market, and the relevant market is the area of effective competition within which the defendant operates. *Id.* It includes a geographic market, which is the section of the country in which sellers of a particular product operate, as well as a product market, which encompasses the differences among various commodities and the willingness of buyers to substitute one product for another. Failure to define the market in which the monopoly is allegedly exercised is fatal to a monopolization claim. *Id.* at 120.[187]

---

[185] Rec. Doc. 42, p. 26.
[186] *John River Cartage*, 300 So.3d at 450 (citing *Plaquemine Marine, Inc. v. Mercury Marine*, 2003-1036 (La. App. 1st Cir. 7/25/03), 859 So. 2d 110, 119-20).
[187] *Id.* (citing *Plaquemine Marine*, 859 So.2d at 120).

Defendant moves for summary judgment on this claim, arguing Plaintiffs cannot satisfy the elements of a monopoly.  First, Defendant presents evidence that it lacks the ability to control prices.  Choosing the five towing companies did not give Defendant any ability to control the prices of towing services, which is regulated by the Louisiana Public Service Commission.[188] Second, Defendant has not excluded competition from the market.  Because La. R.S. 32:1735(A) mandates that law enforcement first allow the owner or operator of a vehicle the option to select their preferred towing company before resorting to the towing rotation list, Defendant has not excluded Plaintiffs, or any other non-list towing companies, from the relevant market.  Accordingly, Plaintiffs are not excluded from participating in the towing market for the City of Gonzales simply because they are not on Defendant's towing rotation list. Defendant submits as evidence the testimony of both Plaintiffs that they still receive towing requests within the City of Gonzales.[189]

Plaintiffs fail to effectively counter these arguments.  Plaintiffs argue in conclusory fashion that the Defendant "possessed the power to monopolize the towing industry within the City of Gonzales and did so when it restricted tows to only towing companies politically affiliated with defendant and Chief Jackson."[190]  This does not suffice to overcome summary judgment.  Plaintiffs offer no summary judgment evidence to counter the evidence that Defendant does not control prices, that vehicle owners/operators maintain the choice to select their preferred towing company, and that Plaintiffs do not continue to receive callouts (albeit less) within the City of Gonzales.

---

[188] *See* La. R.S. 32:1734, 45:163 & Rec. Doc. 39-19.
[189] Rec. Doc. 39-4, p. 107; Rec. Doc. 39-6, pp. 55-56.
[190] Rec. Doc. 42, p. 27.

As for identifying the relevant market, Plaintiffs state only that the relevant market "is the towing market within the City of Gonzales requested by dispatch/called from the police department."[191] But a relevant market cannot be defined so narrowly. The relevant market is not only the tows subject to callout by law enforcement; rather, the relevant market is the towing industry in the City of Gonzales.[192] Plaintiffs offer evidence about Chief Jackson's ability to influence the towing rotation list, but the list represents only a portion of the relevant market, and there is no summary judgment evidence before the Court to demonstrate the size of that market. There is also no record evidence to suggest that Defendant's towing rotation list represents a significant portion of the overall tow market in the City of Gonzales.

The Court finds the reasoning and analysis by the Western District of Louisiana in *Giddens v. City of Shreveport* applicable here. In *Giddens*, vehicle towing and storage companies filed suit against the city challenging an ordinance that provided for the central storage location of towed vehicles and the city's contract with one company to provide these services.[193] The plaintiffs in *Giddens* asserted claims under La.R.S. 51:122 and R.S. 51:123. The court rejected the plaintiffs' claims for the following reasons:

> In this case, plaintiffs fail to establish an anticompetitive practice within the meaning of antitrust law. The only types of towing and storage transactions at issue in this case are those in which the vehicle owner, for whatever reason, is unable or unwilling to participate in the decision of where his vehicle will be stored. Both before and after the amendment to the ordinance, the consumer simply did not participate in the storage decision. Thus, it is not possible to conclude that the change to a central storage facility, even if injurious to the business interests of some of the plaintiffs, reduced consumer welfare or bargaining power. **Any instance where the consumer is involved in the decision of where his vehicle is to be**

---

[191] *Id.* at p. 26.
[192] *See A-Pro Towing and Recovery, LLC v. City of Port Isabel*, No. 1:19-CV-00016, 2020 WL 4794657, at *10 (S.D. Tex. Aug. 18, 2020).
[193] 901 F.Supp. at 1170.

**stored is beyond the purview of this case (and there is of course no city ordinance which prohibits an owner from storing his vehicle at the location of his choice).**

The absence of an anticompetitive injury to the market is enough to terminate the antitrust injury. Even assuming that an anticompetitive practice were present, however, its consequences are outweighed by the legitimate public interests served by a central storage facility, as discussed above in connection with the substantive due process issue.

In summary, rule of reason analysis leads to the conclusion that the City's contract with Twin City and its use of a central storage facility is not an unreasonable restraint of trade or commerce.[194]

The Court finds that Plaintiffs have failed to submit summary judgment evidence to demonstrate genuine fact disputes regarding their antitrust claims. Plaintiffs fail to point the Court to a single decision that supports their arguments. The undisputed summary judgment evidence demonstrates that (1) towing rotation lists with a limited number of companies is lawful and they are utilized by most municipalities; (2) any anticompetitive consequences of Defendant's towing rotation list are outweighed by the public benefits the policy provides; (3) Defendant does not have monopoly power, *i.e.* the power to control prices; (4) Defendant's towing rotation list does not unreasonably restrict trade and commerce because the vehicle owner/operator has the option to select their preferred towing company; (5) Plaintiffs have not identified the "relevant market"; and (6) Plaintiffs still receive callouts in the City of Gonzales.

Accordingly, summary judgment is GRANTED in favor of Defendant on Plaintiffs' antitrust claims.

---

[194] *Id.* at 1180-1181 (emphasis added).

III.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment[195] is GRANTED as to Plaintiffs' Louisiana antitrust claims, and these claims are dismissed with prejudice.  Defendant's motion is DENIED as to all other claims.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on September 27, 2024.

_____
**SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA**

---

[195] Rec. Doc. 39.